**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AMALGAMATED BANK, on behalf of itself and all others similarly situated, | |
| Plaintiff, | Docket No. |
| - against - | |
| | **CLASS ACTION COMPLAINT** |
| FAIR ISAAC CORPORATION, | |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff Amalgamated Bank ("Plaintiff"), on behalf of itself and all other similarly situated residents of the United States, complains upon knowledge as to itself and its acts and upon information and belief as to all other matters, against Defendant Fair Isaac Corporation ("Defendant" or "Fair Isaac") for violations of the Sherman Act and state laws from at least January 1, 2006 through the date on which the anticompetitive effects of Defendant's unlawful conduct ceased, but no sooner than the present (the "Class Period"). Based upon personal knowledge, information and belief, investigation by counsel, proceedings and admissions made in *Fair Isaac Corp. v. Trans Union LLC,* 17-cv-08318 (N.D. Ill.), and related ongoing federal government investigations, Plaintiff alleges:

## INTRODUCTION

1.      "Credit Scores" rank or "score" creditworthiness within a range by applying certain algorithms to credit histories. This process results in a three digit Credit Score. Two distinct markets exist for Credit Scores in the United States: (1) the market for the sale of Credit Scores to lenders, financial institutions, and businesses in making risk management decisions (the "B2B Credit Score Market"); and (2) the direct market for the sale of consumers' own Credit Scores to enable monitoring of their own credit records (the "business-to-consumer" or "B2C Credit Score Market").

2.      This action relates to the B2B Credit Score Market, which Fair Isaac has unlawfully monopolized for years due to its dominant position with a 90% market share.

3.      Fair Isaac has leveraged its dominant market position by engaging in anticompetitive and exclusionary conduct including suppressing competition, obstructing innovation, and limiting access to credit for millions of Americans.  Fair Isaac's conduct is in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, in addition to state antitrust and unfair trade practices laws.

4.      Fair Isaac's FICO Credit Scores ("FICO Scores") have had a dominant market position for over two decades.  Fair Isaac executives, including public affairs manager Craig Watts

("Watts"), have bragged that their FICO Scores are "the 800- pound gorilla"[1] and experts have opined that Fair Isaac's FICO Scores are "deeply embedded in the U.S. financial system[.]"[2] In 2017, Fair Isaac admitted that it has maintained a market share of 90% or more for at least 13 years. Fair Isaac advertises that "90% of top lenders use FICO® Scores when making lending decisions."[3]

5.      Equifax, Experian, and TransUnion (collectively, the "Credit Bureaus") are credit reporting agencies that collect, standardize, and distribute information concerning consumer credit activity. Credit Bureaus sell credit reports and Credit Scores, including Fair Isaac's FICO Scores, to lenders, financial institutions, and other businesses. These businesses use the credit reports and Credit Scores to make decisions about whether to extend credit and on what terms. Credit Bureaus sell credit reports and Credit Scores to businesses in every state in the United States. Credit Bureaus have long acted as Fair Isaac's agents and co-conspirators to broker sales of FICO scores between businesses and Fair Isaac. Fair Isaac has used distribution agreements with the Credit Bureaus to: (1) place restrictions on the Credit Bureaus' ability to develop or distribute their own competitive Credit Scores; (2) prohibit Credit Bureaus from individually negotiating royalty prices for FICO Score access; (3) charge discriminatory royalty prices for FICO Scores when a Credit Bureau customer purchases a FICO Score while providing the consumer with a competing score; and (4) increase the royalty prices paid by Credit Bureaus. Despite these restrictions, the Credit Bureaus have agreed to and complied with Fair Isaac's agreement conditions.

---

[1] Dana Dratch, *What Does 'Good' Credit Really Mean?,* BANKRATE, (published Oct. 30, 3008, updated Aug. 5, 2010), https://www.cnbc.com/id/27458815.

[2] Nina Zdinjak, *Here is What Newbrook Capital Advisors Thinks of Fair Isaac Corporation (FICO),* INSIDER MONKEY, (Apr. 15, 2019), https://finance.yahoo.com/news/newbrook-capital-advisors-thinks-fair-162450887.html.

[3] https://www.myfico.com/credit-education/fico-scores-bridge.

6.     In 2006, the Credit Bureaus jointly formed VantageScore Solutions, LLC ("VantageScore"), and launched VantageScore, an alternative competitive Credit Score. Since its creation, VantageScore was extremely accurate and was competitively priced, making it more attractive than Fair Isaac's FICO products to large numbers of Americans. Now, through its full utilization of consumer data from the Credit Bureaus, including rental and utility payments, VantageScore can provide Credit Scores for 30 million more Americans than Fair Isaac's FICO can. If businesses utilized VantageScore, because of its additional features, millions of additional creditworthy Americans would be able to obtain credit at more favorable rates and at a lower cost.

7.     Seeing the threat from VantageScore to its dominant market position, Fair Isaac has acted to discourage widespread adoption of VantageScore. To effectuate this, Fair Isaac has abused its monopoly power to prevent the Credit Bureaus from successfully launching a competitive alternative to FICO Scores and has utilized a public relations and advertising campaign to disparage VantageScore and create doubt about VantageScore's accuracy with lenders and consumers alike.

8.     Fair Isaac has succeeded in preventing the growth of VantageScore or any other potential competing credit scoring system through its exclusionary conduct. By continually suppressing competition, Fair Isaac has been able to increase prices for its FICO Scores, doing so most recently in September 2019. Due to Fair Isaac's suppression of competition, and its insistence that non-compete clauses be included in contractual agreements, VantageScore, or any another credit scoring system, was unable to thrive and gain market share despite creation of an innovative and arguably, superior product. The existence of VantageScore and similar competitive scoring systems would have yielded lower prices paid for B2B Credit Scores by Plaintiff and Class members.

9.     Through its anticompetitive and exclusionary conduct, Fair Isaac has harmed businesses by depriving them of competitive pricing and freedom of choice for Credit Score instruments that would allow them to evaluate credit risk. Eliminating Fair Isaac's stranglehold on the

market by opening the market to competition is essential to ensure competitive prices, product innovation, freedom of choice, and widespread access to credit for all creditworthy Americans.

10.     On February 12, 2018, TransUnion filed antitrust counterclaims for monopolization and related claims against Fair Isaac in this District. *See Fair Isaac Corp. v. Trans Union LLC*, 1:17-cv-08318, ECF No. 38 (redacted counterclaims). On March 27, 2019, Judge Sharon Johnson Coleman denied Fair Isaac's motion to dismiss TransUnion's antitrust counterclaims. *See id.*, ECF No. 96. The matter is ongoing.

11.     On March 15, 2020, Fair Isaac disclosed that it was notified two days earlier that it was being investigated by the United States Department of Justice Antitrust Division for exclusionary conduct relating to the same conduct alleged in the counterclaims upheld by Judge Coleman.[4]

## **PARTIES**

### A.      **Plaintiff**

12.     Plaintiff Amalgamated Bank is a New York state chartered commercial bank and trust company with a principal place of business at 275 Seventh Avenue, New York, New York 10011.

13.     Plaintiff is the largest union-owned bank in the United States. Workers United and affiliated organizations are the largest shareholders. Plaintiff provides financial services, including personal banking services for consumers, and services for businesses, non-profit organizations, and institutional investing services.

14.     During the Class Period, Plaintiff directly purchased B2B Credit Scores from Defendant and from members of the Credit Bureaus.

---

[4] *See* Press Release, Fair Isaac Corporation, FICO Statement Regarding Antitrust Investigation, (Mar. 15, 2020), https://www.prnewswire.com/news-releases/fico-statement-regarding-antitrust-investigation-301024452.html.

15. Plaintiff suffered injury in its business or property as a direct, proximate, and material result of Defendant's violations of law.

16. Plaintiff is at continual risk of additional injury to its business and property by reason of Defendant's continuing violations of law.

**B. Defendant**

17. Defendant Fair Isaac Corporation is a Delaware corporation, with a principal place of business at 181 Metro Drive, Suite 700, San Jose, California 95110.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this action pursuant to Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 2, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§15 and 26.

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1332(d), and 1337.

20. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

21. Venue is proper in this District pursuant to 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c) and (d). During the Class Period, Defendant resided, transacted business, was found, or had agents in the United States, including in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

22. During the Class Period, Defendant's conduct was within the flow of, was intended to, and did have a substantial effect on the interstate commerce of the United States, including in this District.

23.     During the Class Period, Defendant used the instrumentalities of interstate commerce, including interstate wires, United States Postal Service mail, and wireless spectrum to effectuate its illegal scheme.

24.     Defendant's conduct also had a substantial effect on the intrastate commerce of at least the following states: Arizona; Arkansas; California; Connecticut; Florida; Hawaii; Illinois; Iowa; Kansas; Maine; Maryland; Massachusetts; Michigan; Minnesota; Mississippi; Missouri; Montana; Nebraska; Nevada; New Mexico; New York; North Carolina; North Dakota; Oregon; Rhode Island; South Carolina; South Dakota; Tennessee; Utah; Vermont; West Virginia; and Wisconsin; as well as the District of Columbia.

25.     This Court has personal jurisdiction over Defendant because Defendant utilized this District to transact business, maintain substantial contacts, and commit unlawful conduct. Defendant's unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, otherwise located in, or doing business in this District.

26.     Plaintiff purchased at least one FICO Score from Experian, which employs Credit Score business personnel in this District.

27.     Defendant employs Credit Score business personnel in this District.

28.     Defendant is registered to do business in Illinois with the Illinois Secretary of State.

29.     Defendant selected this District to initiate litigation against Trans Union LLC, Case No. 1:17-cv-08318, to which this case is filed as related by Plaintiff.

## SUBSTANTIVE ALLEGATIONS

### I.     Background

#### A.     Credit Scores

30.     Credit Scores are three-digit numbers that are meant to assess credit risk. Consumers with higher Credit Scores generally pose less credit risk than those with lower Credit Scores. Credit

6

Scores are created through the use of a credit scoring algorithm to provide a consumer credit report. Credit Scores are usually paired with "reason codes," which detail information about what caused reductions to a particular consumer's Credit Score.

31. In the United States, Credit Scores are the most widely used indicators of consumers' creditworthiness. Financial institutions, lenders, and other businesses use Credit Scores in making consumer credit decisions. Consumers rely on Credit Scores to determine their ability to procure a mortgage, auto loan, or credit card, in addition to the rate that they will pay.

32. The Credit Bureaus collect and supply aggregated consumer credit data in consumer reports. The Credit Bureaus collect credit and financial data about consumers from creditors, collection agencies, governmental entities, public records, and other third parties. The Credit Bureaus then compile this information to create a credit file. The Credit Bureaus sell credit reports, which include consumer credit file information, to businesses and consumers.

33. Although Credit Scores are sometimes bundled and sold together with credit reports, they are two different products and credit reports can be sold independently of Credit Scores. Credit reports have detailed information about the credit activity and current credit situation of consumers. A credit report could include information about a consumer's mortgage payment history, credit card balances and payments, and credit inquiries. A Credit Score is based on the information provided in a credit report, which ultimately yields a single three-digit number assessment.

**B.    The B2B and B2C Credit Score Markets in the United States**

34. In the United States, there are two markets for Credit Scores, the B2B Credit Score Market, and the B2C Credit Score Market. B2B Credit Scores and B2C Credit Scores serve different purposes and are priced and purchased differently.

35. Financial institutions, lenders, and other businesses in the B2B Credit Score Market use Credit Scores to assess consumer creditworthiness and make lending decisions. These institutions,

lenders, and businesses do not consider credit reports or other borrower information to be a substitute for Credit Scores.

36.　　In contrast, in the B2C Credit Score Market, consumers purchase their own Credit Scores to gauge their own creditworthiness and determine how they will be categorized by potential lenders and creditors.

37.　　The United States is the relevant geographic market in which B2B Credit Scores are provided because the restraints on competition contained in Fair Isaac's contracts relate to the provision of B2B Credit Scores to businesses across the United States.

38.　　B2B Credit Score Market purchasers include financial institutions, lenders, and other businesses that purchase B2B Credit Scores to make risk management decisions ("B2B Purchasers"). Financial institutions, lenders, and other businesses that purchase Credit reports from Defendant and/or the Credit Bureaus generally do so to: (1) determine the identity and credit-worthiness of qualified borrowers to whom a preapproved offer of credit offer will be extended; (2) make lending decisions, and (3) evaluate the risk for existing borrowers, including for purposes such as offering to extend additional credit or making changes to other account terms.

39.　　In contrast, customers in the B2C Credit Score Market purchase Credit Scores to assess their likelihood of obtaining credit, otherwise manage their credit, or protect their identity. Presently, millions of American consumers have signed up for credit monitoring or identity protection services. Many of those credit monitoring accounts provide consumers with their Credit Score.

40.　　The credit risk scoring industry, including industry and policy analysts, and investors distinguish the B2B Credit Score Market and the B2C Credit Score Market as two distinct markets. Fair Isaac also views the B2B Credit Score Market as distinct from the B2C Credit Score Market. In its 2019 Form 10-K, Fair Isaac described different components of its Scores reportable segment

including its "business-to-business scoring solutions and services" and the "myFICO® solutions for consumers."

41.     The B2B Credit Score Market has high barriers to entry.  B2B Purchasers face significant "switching costs" if they adopt a new Credit Score that has different score-to-risk relationships or that uses different reason codes, regardless of whether it is an updated version of the score they already use or an entirely new brand of Credit Score. This is not the case for B2C Credit Score Market consumers.  Switching costs for B2B Purchasers arise because: (1) employees require training in the properties and elements of a new score; (2) B2B Purchasers must verify that the new score will adequately predict the creditworthiness of their existing customers; (3) B2B Purchasers often conduct extensive and costly validation tests to determine whether the new score is cost-effective; and (4) B2B Purchasers often need to update their internal systems to ensure technical compatibility between their systems and a new score.

42.     The B2B Credit Score Market is also characterized by network effects. In certain industries, such as the industries for mortgages and auto loans, the use of Credit Scores with similar score-to-risk relationships and reason codes allows the bundling of mortgage and auto loans from different originators into securities that can be sold to investors. Consistent use of a single type of Credit Score allows the marketing materials for these securities to include data about the average Credit Scores of the borrowers associated with the underlying loans.

**C.     Fair Isaac Has Maintained Monopoly Power in the B2B Credit Score Market for Decades**

43.     Fair Isaac has maintained its monopoly over the B2B Credit Score Market in the United States for nearly three decades, largely through the anticompetitive dominant nature of its FICO product line, which includes several different types of FICO Scores.  Introduced over thirty years ago, Fair Isaac's "FICO Classic" Credit Scores are the most widely known and used B2B Credit Scores in the United States. FICO Classic applies an algorithm to each Credit Bureau's data

and generates a score between 300 and 850 that purportedly provides an indication of the individual's credit risk level. FICO Classic also generates "reason codes" that explain why the consumer has not been assigned the maximum score of 850.

44.     Fair Isaac does not attempt to hide its B2B Credit Score Market monopoly power. Instead, it advertises its monopoly power, stating that 90% of all lending decisions in the United States utilize FICO Scores, even boasting on its website that 100 billion FICO Scores have been sold.  Fair Isaac also brags that its sales are four times the number of McDonald's worldwide yearly sales of hamburgers, and its daily FICO Scores sales are more than double Starbucks' worldwide daily coffee sales.[5]

45.     Similarly, in its 2019 Form 10-K, Fair Isaac described its "FICO Scores" as "the standard measure in the U.S. of consumer credit risk" and reported that "FICO Scores are used in the majority of U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders, and auto loan originators."

46.     Representatives for Fair Isaac, including Watts, have labeled Fair Isaac's FICO score as "the 800- pound gorilla" in the market for B2B Credit Scores,[6] and as previously noted, bragged about Fair Isaac's dominant 90% market share. For example, in November 2017, Fair Isaac's CFO and Executive Vice President, Michael Pung, stated that Fair Isaac's FICO Scores are used by nearly every major lender and are the most widely used credit scoring system in the United States.

47.     Fair Isaac representatives have also recognized their benefit from the widespread use of FICO Scores throughout many different industries. On November 3, 2011,

---

[5] *FICO Knows A Lot About You But What Do You Know About FICO?*, ADVISORBOX, http://advisorbox.com/fico-knows-lot-know-fico/ (citing http://www.fico.com/en/about-us#at_glance).

[6] Dana Dratch, *What Does 'Good' Credit Really Mean?,* BANKRATE, (published Oct. 30, 2008, updated Aug. 5, 2010), https://www.cnbc.com/id/27458815.

at Fair Isaac's Analyst/Investor Day, Fair Isaac's then-CEO, Mark Greene, explained that the network effect of FICO Scores being the industry standard and "having everybody . . . standardize on a FICO Score, that's magic."[7]

48.     Fair Isaac's monopoly power in the B2B Credit Score Market for Credit Scores has provided it with the power to control prices. Fair Isaac's CEO, Will Lansing ("Lansing"), has stated that in the B2B Credit Score Market, Fair Isaac has the ability to decide where it wants its margins to be.

## II.     Fair Isaac's Monopoly in the B2B Credit Score Market Has Eliminated the Chances of any Potential Competitors

49.     Nearly 15 years ago, VantageScore introduced the VantageScore Credit Score and credit scoring system. VantageScore is a competitor to FICO Scores in the B2B Credit Score Market.

50.     From the time it was first released in March 2006, VantageScore has been able to score millions more consumers than the FICO scoring systems. VantageScore had more dynamic capabilities because it calculated scores for consumers that had not used credit for up to two years.  It also had far-reaching access to many more consumers by using utility and telecommunications payment histories reported to the Credit Bureaus. In contrast, Fair Isaac's FICO scoring systems would not generate a score if a consumer did not use credit in over six months or if a credit account was opened less than six months ago.

51.     Due to its expansive reach, VantageScore now issues Credit Scores for 30 million more Americans than traditional FICO scoring systems. Fair Isaac's FICO Classic credit scoring systems, which are still used by many lenders, exclude large numbers of creditworthy Americans that can be reliably scored by VantageScore. Roughly 25 percent of American adults, or about 65 million people,

---

[7] Fair Isaac Corp. – Analyst/Investor Day Transcript, (Nov. 3, 2011), https://seekingalpha.com/article/307417-fair-isaac-corp-analyst-investor-day.

do not have a traditional FICO score. Through widespread usage of VantageScore, the number of adults without a Credit Score would be cut nearly in half. Remarkably, approximately ten million of those newly scored individuals would be classified as "prime" borrowers that would be extremely attractive to financial institutions and lenders.

52.     For any consumers without a Credit Score, it is difficult if not impossible to successfully obtain a mortgage, car loan, or reasonable interest rates for personal lines of credit. The implications of not having a Credit Score can even affect a consumer's ability to rent an apartment, as Credit Scores are increasingly used by landlords in their tenant screening process.

53.     Low-income and minority consumers make up a disproportionate percentage of the individuals excluded by Fair Isaac's traditional FICO scoring systems. The lack of access for these affected individuals results in a greater likelihood of their being denied access to credit cards, auto and home loans, and apartment housing.

54.     The Consumer Financial Protection Bureau ("CFPB") published a report which stated that Black and Hispanic consumers are considerably more likely to be credit invisible or have unscored credit records than White consumers. About 15 percent of Black and Hispanic consumers are credit invisibles compared to just nine percent of White consumers. An additional 13 percent of Black consumers and 12 percent of Hispanic consumers have records that cannot be scored under the widely-used model, compared to just seven percent of White consumers. CFPB analysis suggests that these differences across racial and ethnic groups materialize early in the adult lives of these consumers and persist thereafter.[8]   However, through usage of VantageScore, a score could be calculated for

---

[8] *CFPB Report Finds 26 Million Consumers Are Credit Invisible*, CFPB, (May 5, 2015), https://www.consumerfinance.gov/about-us/newsroom/cfpb-report-finds-26-million-consumers-are-credit-invisible/.

roughly 9.5 million Hispanic and Black consumers who do not currently have a FICO score, with over 2.5 million of these minority consumers qualifying for "prime" borrowing status.

55.     Despite the tremendous benefits that using VantageScore would provide to millions of consumers, Fair Isaac continues to maintain its monopoly position in the B2B Credit Score Market. On February 27, 2013, at a Morgan Stanley Technology, Media & Telecom Conference, Lansing explained that despite the presence of VantageScore in the market, "there's not that much competition around our [B2B] scores business" because "[t]he FICO scores are very much part of the fabric of the banking industry."[9]

## III.    Fair Isaac Has Contracted with the Credit Bureaus as Agents and Co-Conspirators to Monopolize the B2B Credit Score Market

56.     Despite the Credit Bureaus' attempts to compete in the B2B Credit Score Market, due to its dominant market position, Fair Isaac is able to employ the Credit Bureaus in its scheme to extend the shelf life of its monopoly. Fair Isaac depends on the Credit Bureaus to help foster its relationship with B2B Purchasers. Fair Isaac enlists the Credit Bureaus for assistance with the sale of its FICO Scores to these B2B Purchasers.

57.     For B2B Purchasers that require a Credit Score, they purchase the report from the Credit Bureau, and the Credit Score jointly from the Credit Bureau and Fair Isaac. At times, payment may at times occur in a single transaction, but practically speaking, as expressly stated in B2B Purchasers' contract terms, both the Credit Bureau and Fair Isaac serve as the provider of the FICO Score.

---

[9] Morgan Stanley Technology, Media & Telecom Conference Transcript, (Feb. 27, 2013), https://seekingalpha.com/article/1231981-fair-isaacs-ceo-presents-at-morgan-stanley-technology-media-and-telecom-conference-transcript.

58.     B2B Purchasers' FICO Scores contracts are often referred to as Credit Scoring Services Agreements ("CSSAs"). CSSAs provide for both the payment method and fee model for the delivery of Credit Score services.

59.     In Plaintiff's and Class Members' obtaining of FICO Scores, the Credit Bureaus serve as co-conspirators and agents of Fair Isaac. Pursuant to common terms of CSSAs, the Credit Bureaus often deliver subscriber invoices for Credit Scores that dictate payment should be made to Fair Isaac.

## IV.     Fair Isaac's Additional Anticompetitive and Exclusionary Conduct

60.     Fair Isaac utilized its monopoly power to coordinate a campaign to eliminate competition from VantageScore and has explicitly stated that this is its end goal. On April 23, 2015, Lansing informed investors on a quarterly earnings conference call that Fair Isaac's strategic goal was to ensure that "the entire industry adopts FICO scores instead of [other] scores."[10] Remarkably, thanks to its dominant position in the B2B Credit Score Market, Fair Isaac has enlisted its competitors, the Credit Bureaus, which jointly own and control VantageScore, to sign anticompetitive contracts that: (1) prevent them from developing or selling alternative Credit Scores that could be seamlessly integrated into lenders' systems, or at a minimum, could be used interchangeably with FICO Scores; (2) prevent them from competing with each other to negotiate better prices from FICO; and (3) create a pricing scheme effectively eliminating the possibility that B2B Purchasers choose to use FICO Scores in their lending decisions at the same time as providing customers with a competing Credit Score, such as VantageScore. Concurrently, Fair Isaac has smeared VantageScore in the media and has made false and misleading statements to establish doubt about VantageScore's accuracy and reliability. Through such anticompetitive and exclusionary conduct, Fair Isaac has injured and essentially

---

[10] Fair Isaac's (FICO) CEO Will Lansing on Q2 2015 Results – Earnings Call Transcript, (Apr. 23, 2015), https://seekingalpha.com/article/3097846-fair-isaacs-fico-ceo-will-lansing-on-q2-2015-results-earnings-call-transcript.

eliminated competition in the B2B Credit Score Market, drastically increased prices for Plaintiff and the Class, and severely limited access to credit for millions of Americans.

### A. Fair Isaac and the Credit Bureaus Have Executed Contracts with Anticompetitive Terms that Restrict the Credit Bureaus' Ability to Compete and Sell VantageScore

61.     In January 2015, Fair Isaac and TransUnion entered into a contract, the Analytic and Data License Agreement. Fair Isaac utilized the December 31, 2014 contract expiration date to demand that the parties enter into a new contract rather than simply renew their existing contracts. Fair Isaac represented to TransUnion that the other Credit Bureaus, Experian and Equifax, already agreed to new contracts with Fair Isaac that were materially similar. If TransUnion did not agree to Fair Isaac's desired terms, it would lose substantial business from customers that depend on FICO Scores. On information and belief, the Credit Bureaus all agreed to Fair Isaac's terms and its plan to exclude competitors and maintain its monopoly.

### 1. Through the Anticompetitive Agreements Fair Issac Restricted the Credit Bureaus' Ability to Develop or Sell Other Credit Scores Compatible with B2B Purchasers' Existing Systems

62.     Fair Isaac has imposed similar or identical "No Equivalent Products" clauses on each of the Credit Bureaus. By imposing the "No Equivalent Products" terms, Fair Isaac has sought to eliminate the Credit Bureaus' ability to offer alternative Credit Score products, such as VantageScore, that would allow B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring increases in costs to redesign their lending programs and systems, or to use VantageScore in addition to or interchangeably with FICO Scores. The Credit Bureaus have agreed to Fair Isaac's demands in these anticompetitive agreements, terms, and the resulting anticompetitive effects.

63.     The "No Equivalent Products" clauses provide that the Credit Bureaus may not internally develop a credit scoring system that is aligned to the odds-to-score relationship of any Fair Isaac Analytic or that uses more than a limited number of reason codes that "match" reason codes

used by any Fair Isaac Analytic. These clauses also prohibit the Credit Bureaus from distributing any competing analytic, such as a credit scoring system, that is aligned with FICO Scores or uses too many of the same reason codes. These clauses expressly name Vantage Score Solutions LLC as a developer of such a scoring system that may not be distributed in the event that VantageScore ever offered an "Equivalent Product."

64. For example, if a competing Credit Score product used a 750 score to designate a less-than-one-percent risk of credit delinquency, and if a 750 FICO score also designated the same risk of delinquency, then the "No Equivalent Products" clause prevents the Credit Bureaus from distributing the competing product. Similarly, if a competing Credit Score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause prohibits the Credit Bureaus from distributing the product.

65. Ultimately, the "No Equivalent Products" clauses prevent the Credit Bureaus from developing or selling an alternative to FICO's Credit Scores that would be compatible with many B2B Purchasers' systems, models, and processes, and would allow B2B Purchasers to have a real choice between using FICO Scores and some alternative score. Many B2B Purchasers have expended substantial efforts and resources to develop systems, models, and processes that are designed for FICO Scores compatibility. B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship, providing a given ratio of non-defaulting consumers to defaulting consumers for each given score, and reason codes indicating the particular reasons listed for increased risk of default. An example of this tailoring is bank software designed to accept one or more FICO Scores and reason codes, that combines this information with internally collected data, and automatically produces a lending decision.

66. The "No Equivalent Products" clauses in contracts with the Credit Bureaus allow Fair Isaac to maintain its monopoly. The odds-to-score relationship is simply an arbitrary mapping

between credit risk and score and does not constitute protectable intellectual property. Similarly, the reason codes that may not be used by any "Equivalent Product" were not invented by Fair Isaac but are instead based on well-established industry best practices for lending.

> **2.** **Fair Isaac's Anticompetitive Agreements Restrict the Credit Bureaus' Ability to Develop or Sell Other Credit Scores Compatible with B2B Purchasers' Existing Systems**

67. Fair Isaac's contracts with each Credit Bureau include a similar or identical "Dynamic Royalty Schedule" clause and a similar or identical "Pre-Qualification" royalty category. Through use of the "Pre-Qualification" royalty category, Fair Isaac has effectively eliminated lenders' ability to purchase and utilize a FICO score in their lending decision while also providing a consumer with a competing Credit Score. This causes lenders to buy Fair Isaac's FICO Scores exclusively rather than consider and potentially purchase competing Credit Scores, such as VantageScore. Due to Fair Isaac's unilateral inclusion of the "Pre-Qualification" royalty category, TransUnion has lost massive amounts of sales of VantageScore to major banks so they can provide the scores to consumers.

68. In the 2015 agreements, Fair Isaac demanded, and the Credit Bureaus have complied with, a new "Pre-Qualification" royalty category, which Fair Isaac describes as an End User's qualification of a potential consumer customer for that End User's own internal lending offering. The "Pre-Qualification" royalty category distinguishes between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any Credit Score or credit data to consumers; and (2) lenders that use FICO Scores for "Pre-Qualification" in addition to providing Credit Scores or credit data to consumers related to the "Pre-Qualification." Certain banks and lenders offer consumers opportunities to apply to qualify for credit opportunities (*e.g.*, a credit card or loan) and, simultaneously, receive their personal Credit Score. In many instances, this offer of a free Credit Score can entice consumers to apply for credit opportunities.

69. The royalty price associated with a FICO score used for "Pre-Qualification" depends on whether other Credit Scores or credit data are provided to consumers. If a lender purchases a FICO score for use in "Pre-Qualification" and does not provide any Credit Score or credit data to the consumer "in connection" with the "Pre-Qualification," there is one per-score royalty rate. If the lender purchases a FICO score for use in "Pre-Qualification" and provides any other Credit Score to the consumer "in connection" with the "Pre- Qualification," a higher penalty per-score royalty rate is imposed.

70. The penalty rate can be avoided through exclusive purchase of FICO Scores. In one example, the B2B Purchaser could purchase a FICO score for use in "Pre-Qualification" and provide no Credit Score or credit data to the consumer. In the alternative, the B2B Purchaser could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of Credit Scores by lenders with the provision of Credit Scores to consumers.

71. No legitimate business justification exists for the penalty rate agreed upon by Fair Isaac and the Credit Bureaus when the lender also purchases any other Credit Score to disclose to consumers. The only reason for the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase FICO Scores exclusively and make it cost-prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing Credit Score to disclose to consumers. Fair Isaac's scheme has been hugely successful, with very few B2B Purchasers opting to pay the penalty rate.

### 3. Fair Isaac Has Extracted Monopoly Prices from B2B Purchasers Facilitated by its Anticompetitive Contracts with the Credit Bureaus

72. In its Agreements, Fair Isaac requires a "Level Playing Field," in which the prices that are made available to one Credit Bureau are made available to all of the Credit Bureaus. Combined with the "Dynamic Royalty Schedule" clause, the "Level Playing Field" clause enables Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores. Fair Isaac's contracts with each of

the Credit Bureaus include similar or identical "Dynamic Royalty Schedule" and "Level Playing Field" provisions.

73.     B2B Purchasers have paid monopoly prices due to Fair Isaac's implementation of the "Dynamic Royalty Schedule" and "Level Playing Field" provisions in its contracts with the Credit Bureaus. These provisions disincentivize the Credit Bureaus from negotiating for a lower price because each one knows that even the negotiation is successful, no competitive advantage over the other Credit Bureaus will be gained.

### B.     Fair Isaac Disparaged VantageScore in an Aggressive Public Relations Campaign to Create Doubt About VantageScore's Viability Among B2B Purchasers

74.     Unsatisfied with its successful implementation of anticompetitive restrictions that eliminated VantageScore's ability to compete with FICO, Fair Isaac went even further and waged an aggressive public relations campaign to spread false statements and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. Fair Isaac has disparaged VantageScore by  calling it a "Fako" score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented VantageScore's credit scoring system and its overall process.

75.     On December 12, 2017, Fair Isaac placed a full-page advertisement in *The Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates" that criticized VantageScore, despite not identifying it by name.  The advertisement presented Fair Isaac as independent from the Credit Bureaus and stated that Fair Isaac's FICO Scores have been used by lenders and securitization investors for decades.  In contrast, the advertisement described an alternative Credit Score, owned by the Credit Bureaus as less reliable than FICO Scores in evaluating credit risk.  The advertisement unambiguously conveyed the false message that VantageScore weakened scoring standards, and harmed both consumers and the market, particularly the B2B Credit Score Market.

76.     Fair Isaac's advertisement in the *Wall Street Journal* also directed readers to view a Fair Isaac-owned website that connects visitors to articles and blog posts that further disparage VantageScore directly by name. A November 15, 2016 blog post asserts: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."[11]

77.     Fair Issac's implication that FICO Classic scoring systems provide Credit Scores for as many consumers as VantageScore is erroneous and misleading to the B2B Credit Score Market and consumers. As described *supra*, VantageScore provides Credit Scores for millions of American consumers that are not scored by FICO Classic scoring systems.

78.     Fair Isaac's website includes numerous posts that disparage VantageScore and make false or misleading statements about VantageScore's features. A November 16, 2015 blog post claims that "[r]esearch results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance."[12] This statement is false and misleading because it attempts to present VantageScore's scoring model as "weak" and as doing a "poor job forecasting future performance" because it considers a consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. Despite Fair Isaac's claims, studies have shown that VantageScore is strongly predictive.

79.     Fair Isaac's blog post from February 6, 2017 asserts that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not."[13] Fair Isaac's

---

[11] Joanne Gaskin, *Truth Squad: Will Looser Scoring Standards Help Millions More Americans Get Mortgages?*, FICO BLOG, (Nov. 15, 2016), https://www.fico.com/blogs/truth-squad-will-looser-scoring-standards-help-millions-more-americans-get-mortgages.

[12] Ethan Dornhelm, *Why Bureau Data Alone Can't Score More Consumers*, (Nov. 16, 2015), FICO BLOG, https://www.fico.com/blogs/why-bureau-data-alone-can-t-score-more-consumers.

[13] Joanne Gaskin, *Truth Squad: Is FICO Score 700 the Same as VantageScore 700?*, (Feb. 6, 2017), FICO BLOG, https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore-700.

statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. Despite this assertion, the opposite is true. Notably, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non- medical collection accounts and attributes lower penalizes to medical collections than non-medical ones.

80. Fair Isaac's campaign against VantageScore has been ongoing for nearly fifteen years. In 2006, just months after VantageScore's launch, Fair Isaac filed a frivolous lawsuit against the Credit Bureaus and VantageScore in the United States District Court for the District of Minnesota. *See Fair Isaac Corp. v. Equifax Inc.*, No. 06-cv-04112 (D. Minn.). This was the Fair Isaac's initial attempt to eliminate its competitive threat.

81. Fair Isaac's lawsuit included claims that the development of VantageScore violated the antitrust laws and that the development of VantageScore constituted trademark infringement. In its prayer for relief, Fair Isaac sought dissolution of VantageScore. Not only did all of Fair Isaac's claims fail, the jury justly determined that Fair Isaac was the wrongdoer. In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's 501-990 scoring range constituted trademark infringement because it was similar to FICO's scoring range of 300-850. The Credit Bureaus and VantageScore issued counterclaims for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac misrepresented to the PTO that only FICO used the 300-850 score range. The jury concluded that Fair Isaac committed fraud on the PTO by making false statements in its application to register the score range of 300-850 as a trademark.

82. The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

### C. Fair Isaac Eliminates Competition Through its Extensive Anticompetitive and Exclusionary Conduct

83.     Fair Isaac's exclusionary conduct seeking to maintain and expand its monopoly power has harmed for years and continues to harm participants in the B2B Credit Score Market. Fair Isaac's unlawful conduct, including that which has been taken in concert with the Credit Bureaus, has eliminated competition in the B2B Credit Score Market by foreclosing opportunities for the Credit Bureaus to sell VantageScore or any other similar competitive products. Fair Isaac's anticompetitive and exclusionary conduct has allowed it to maintain its monopoly and charge monopoly prices for B2B Credit Scores to B2B Purchasers throughout the Class Period.

84.     Fair Isaac's conduct, in concert with the Credit Bureaus, including by the contracts entered into by the Credit Bureaus, has drastically reduced choice for B2B Purchasers. The anticompetitive terms agreed to between Fair Isaac and the Credit Bureaus have frustrated the ability of B2B Purchasers to purchase VantageScore or any other competitive Credit Score that could be seamlessly integrated into lenders' existing processes and systems. Fair Isaac's media and advertising campaign against VantageScore has successfully instilled uncertainty, and doubt about VantageScore among B2B Purchasers in the marketplace.

85.     Through blog posts and the media, Fair Isaac has spread its message to consumers that VantageScore is a "Fako" score solely because it is not a FICO score. In a post on thebalance.com that was originally posted in February 2017, and that Fair Isaac continues to display today: "If you purchased your Credit Score anywhere but MyFICO.com, then it's a FAKO score."[14]

---

[14] Latoya Irby, *FICO & FAKO Credit Scores*, THE BALANCE, (updated Aug. 18, 2020), https://www.thebalance.com/fico-and-fako-credit-scores-960497.

**CLASS ACTION ALLEGATIONS**

86.     Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on its own behalf and as representative of the following Class:[15]

> All B2B Purchasers residing in the United States that directly purchased a FICO Score from Fair Isaac and/or a Credit Bureau during the Class Period.
>
> Excluded from the Class are: Defendant, its directors, officers, management, employees, subsidiaries, and affiliates. Also expressly excluded from the Class are any natural persons that purchased their own Credit Score for personal use solely via myFico.com, the Credit Bureaus, or other entities.

87.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, members of the Class are readily identifiable from information and records in the possession of Defendant.

88.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages from the same wrongful conduct of Defendant. The injuries and damages of each member of the Class were directly caused by Defendant's wrongful conduct in violation of the laws described herein.

89.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff is an adequate representative of the Class and has no interest which is adverse to the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action antitrust litigation, including class actions in the financial services industry.

---

[15] Plaintiff has defined the Class based on currently available information and herby reserves the right to amend the definition of the Class, including, without limitation, membership criteria and the Class Period.

90.    Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

1.    whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of federal law;

2.    whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of certain state antitrust laws;

3.    whether Defendant engaged in unfair or deceptive trade practices in violation of certain state laws;

4.    the duration of the alleged unlawful conduct;

5.    injury suffered by Plaintiff and members of the Class;

6.    the appropriate measure of damages suffered by Plaintiff and Class members; and

7.    whether Defendant acted or refused to act on grounds generally applicable to Class members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to Class members as a whole.

91.    A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

92.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants.

93. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## STATUTES OF LIMITATIONS AND TOLLING

94. The applicable statutes of limitations relating to the claims for relief alleged herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendant and inherently self-concealing conduct. Due to Defendant's affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiff and members of the Class have been and are tolled, and Defendant is equitably estopped from raising statutes of limitations as a defense.

95. Any applicable statutes of limitations were tolled until at least February 12, 2018, the date that TransUnion filed its Counterclaim against Defendant.

96. The federal government's antitrust investigation of Defendant's unlawful conduct also operates to toll any federal statute of limitations under 15 U.S.C. § 16.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
**(Monopolization)**
**(15 U.S.C. § 2)**

97. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

98. The relevant product market is the market for the sale of B2B Credit Scores.

99. The relevant geographic market for the sale of B2B Credit Scores is the United States.

100. The B2B Credit Score Market is the relevant market.

101. Fair Isaac has had and maintains at least 90% market share in the B2B Credit Score Market.

102.    Fair Isaac has had and maintains monopoly power in the B2B Credit Score Market.

103.    Fair Isaac has had and maintains the power to control prices or exclude competition in the B2B Credit Score Market.

104.    Fair Isaac, through unlawful, anticompetitive and exclusionary acts and agreements, has substantially eliminated any competition in the market for B2B Credit Scores in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

105.    Fair Isaac has demonstrated its monopoly position through its ability to control prices and exclude competition by raising prices to supracompetitive levels despite no corresponding increase in demand.

106.    Fair Isaac's monopoly power is not due to its growth or development or because of a superior product, business acumen, or historic accident.

107.    Fair Isaac's monopoly of the market has injured and will continue to injure competition.

108.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

109.    Fair Isaac's monopolistic conduct raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

110.    Plaintiff and Class members have been injured in their business or property by Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

111.    Plaintiff and Class members are threatened with future injury to their business and property by Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**SECOND CLAIM FOR RELIEF**
**(Conspiracy to Monopolize)**
**(15 U.S.C. § 2)**

112.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

113.    The relevant product market is the market for the sale of B2B Credit Scores.

114.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

115.    The B2B Credit Score Market is the relevant market.

116.    Fair Isaac has had and maintains at least 90% market share in the B2B Credit Score Market.

117.    Fair Isaac has had and maintains monopoly power in the B2B Credit Score Market.

118.    Fair Isaac has had and maintains the power to control prices or exclude competition in the B2B Credit Score Market.

119.    Fair Isaac, through unlawful anticompetitive and exclusionary acts and agreements, has substantially foreclosed competition in the market for B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

120.    Fair Isaac has demonstrated its monopoly position through its ability to control prices and exclude competition by raising prices to supracompetitive levels despite no corresponding increase in demand.

121.    Fair Isaac entered into a combination or conspiracy with the Credit Bureaus to maintain its monopoly power in the B2B Credit Score Market. Fair Isaac created and maintained this conspiracy through a series of agreements with each of the Credit Bureaus. In these agreements, the parties agreed that the Credit Bureaus would not offer or sell VantageScore or any other competing Credit Score to Plaintiff and Class members. Fair Isaac and the Credit Bureaus further agreed that the

27

Credit Bureaus would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiff and Class members.

122.    These agreements eliminated competition in a substantial portion of the B2B Credit Score Market and unlawfully allowed Fair Isaac to maintain its monopoly, resulting in Fair Isaac receiving supracompetitive prices for FICO Scores from Plaintiff and Class members.

123.    Fair Isaac's monopoly power is not due to its growth or development or because of a superior product, business acumen, or historic accident.

124.    Fair Isaac's monopoly of the market has injured and will continue to injure competition.

125.    Fair Isaac has acted with the specific intent of monopolizing the market for B2B Credit Scores in the United States.

126.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

127.    Fair Isaac's conspiracy to monopolize raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

128.    Plaintiff and Class members have been injured in their business or property by Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

129.    Plaintiff and Class members are threatened with future injury to their business and property by Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## THIRD CLAIM FOR RELIEF
### (Unreasonable Restraint of Trade)
### (15 U.S.C. §1)

130. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

131. The relevant product market is the market for the sale of B2B Credit Scores.

132. The relevant geographic market for the sale of B2B Credit Scores is the United States.

133. The B2B Credit Score Market is the relevant market.

134. Fair Isaac and the Credit Bureaus have had and collectively maintain at least 90% market share in the B2B Credit Score Market.

135. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

136. Fair Isaac has had and continues to have the ability to control prices and exclude competition in the B2B Credit Score Market.

137. Fair Isaac entered into separate agreements with TransUnion, Equifax, and Experian that contained anticompetitive terms whereby each Credit Bureau agreed not to offer or sell VantageScore or other competing products to Plaintiff and members of the Class.

138. Fair Isaac's agreements with the Credit Bureaus had substantial anticompetitive effects. The agreements excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

139. Fair Isaac's agreements with the Credit Bureaus raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

140. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

141. Plaintiff and Class members continue to suffer damage, and will continue to do so, if Fair Isaac's anticompetitive conduct does not cease.

142. Plaintiff and Class members have been injured in their business or property by Defendant's violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

143. Plaintiff and Class members are threatened with future injury to their business and property by Defendant's continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## FOURTH CLAIM FOR RELIEF
### (State Antitrust Laws)

144. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

145. By reason of the foregoing alleged herein, Defendant has violated, and Plaintiff and members of the Class are entitled to relief pursuant to the antitrust laws of the States of Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

    i.   Arizona Revised Statutes § 44-1401, *et seq.*;

    ii.   California Cartwright Act, California Business & Professions Code § 16700, *et seq.*;

    iii.   Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24, *et seq.*;

    iv.   District of Columbia Code § 28-4501, *et seq.*;

    v.   Hawaii Revised Statutes § 480-2, *et seq.*;

    vi.   Illinois Antitrust Act, Illinois Complied Statutes § 740, Ill. Comp. Stat. 1011, *et seq.*;

vii.    Iowa Competition Law, Iowa Code § 553.1, *et seq.*;

viii.    Kansas Statutes Annotated § 50-101, *et seq.*;

ix.    Maine Revised Statutes Annotated, tit. 10, § 1101, *et seq.*;

x.    Maryland Code Annotated, Commercial Law, § 11-204, *et seq.*;

xi.    Michigan Compiled Laws § 445.771, *et seq.*;

xii.    Minnesota Antitrust Law of 1971, Minnesota Statutes § 325D.49, *et seq.*;

xiii.    Mississippi Code Annotated § 75-21-1, *et seq.*;

xiv.    Nebraska Revised Statutes § 59-801, *et seq.*;

xv.    Nevada Revised Statutes Annotated § 598A.010, *et seq.*;

xvi.    New Mexico Statutes Annotated § 57-1-1, *et seq.*;

xvii.    New York Donnelly Act, New York General Business Law § 340, *et seq.*;

xviii.    North Carolina General Statutes § 75-1, *et seq.*;

xix.    North Dakota Century Code § 51-08.1-01, *et seq.*;

xx.    Oregon Revised Statutes § 646.705, *et seq.*;

xxi.    Rhode Island General Laws § 6-36-4, *et seq.*;

xxii.    South Dakota Codified Laws § 37-1-3.1, *et seq.*;

xxiii.    Tennessee Code Annotated § 47-25-101, *et seq.*;

xxiv.    Utah Code Annotated § 76-10-3104, *et seq.*;

xxv.    Vermont Statutes Annotated, tit. 9, § 2451, *et seq.*;

xxvi.    West Virginia Code § 47-18-1, *et seq.*; and

xxvii.    Wisconsin Statutes § 133.01, *et seq.*

## FIFTH CLAIM FOR RELIEF
### (State Unfair Trade Practices Laws)

146.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

147.     By reason of the foregoing alleged herein, Defendant has violated, and Plaintiff and Class members are entitled to relief pursuant to the Unfair Trade Practices and Consumer Protection Laws of the States of Arkansas, California, Connecticut, Florida, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, and Vermont, and the District of Columbia, as follows:

i.      Arkansas Code Annotated, § 4-88-101, *et seq.*;

ii.     California Business and Professions Code § 17200, *et seq.*;

iii.    Connecticut Unfair Trade Practices Act, Conn Gen. Stat. § 42-110a, *et seq.*;

iv.     District of Columbia Code § 28-3901, *et seq.*;

v.      Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*;

vi.     Massachusetts Consumer Protection Act, Mass. Gen. L. Ch. 93A, *et seq.*;

vii.    Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

viii.   Montana Code, §30-14-103, *et seq.*, and § 30-14-201, *et seq.*;

ix.     New Mexico Statutes Annotated § 57-12-1, *et seq.*;

x.      New York General Business Law § 349, *et seq.*;

xi.     North Carolina General Statutes § 75-1.1, *et seq.*;

xii.    Rhode Island General Laws § 6-13.1-1, *et seq.*;

xiii.   South Carolina Code Annotated § 39-5-10, *et seq.*; and

xiv.    Vermont Statutes Annotated, tit. 9, § 2451, *et seq.*

32

## PRAYER FOR RELIEF

Plaintiff, on behalf of itself and members of the Class, respectfully demands relief as follows:

A.      That the Court certify this lawsuit as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that Plaintiff be designated as Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.      That Defendant's unlawful conduct alleged herein be adjudged and decreed to violate the federal antitrust laws as set forth herein;

C.      That Defendant's unlawful conduct alleged herein be adjudged and decreed to violate the state antitrust and unfair trade practices laws as set forth herein;

D.      That the Court award Plaintiff and members of the Class actual, treble, and exemplary damages;

E.      That the Court award Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

F.      That the Court award Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law;

G.      That the Court enjoin Defendant from its violations of law; and

H.      That the Court directs such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated April 24, 2020

**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**

*s/ Jennifer W. Sprengel*
Jennifer W. Sprengel (Ill. Bar No. 06204446)
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

*Designated as Local Counsel*

Barbara J. Hart (*pro hac vice* forthcoming)
Christian Levis (*pro hac vice* forthcoming)
Frank Strangeman (*pro hac vice* forthcoming)
Andrea Farah (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: 914-997-0500
bhart@lowey.com
clevis@lowey.com
fstrangeman@lowey.com
afarah@lowey.com

*Counsel for Plaintiff Amalgamated Bank*